In the Matter of the Estate of ANNA CHRISTINE NORMAN BOOTH, Deceased.

Surrogate's Court, New York County, October 23, 1930.

T. *Raymond St. John* [*Arthur Garfield Hays* and *Henry G. Van Veen* of counsel], for the proponent.

*Franklin H. Mills* [*Edmund L. Mooney* and *Wilbur W. Chambers* of counsel], for the contestants.

*Alfred H. Strickland,* for John H. Hayden, legatee.

*Charles E. Buchner* for Claire Cassel, legatee.

O'BRIEN, S. The trial of this will contest was without a jury. The contestants are the mother and husband of testatrix. The trial presented many unusual features although in the last analysis the customary questions of compliance with the statutory requirements in the execution of the will, of testamentary capacity and of undue influence and fraud were the crux of the problem presented to the court. It is appropriate at the outset to set forth certain salient and undisputed facts which form the background of the evidence hereinafter analyzed and discussed.

Testatrix was born in Cincinnati, Ohio, on December 18, 1884. Her father was a native of Sweden; her mother was born in Ohio. They were separated in about 1904 and divorced on July 27, 1906. Testatrix was then twenty-two years old. She had previously visited Europe with her mother. Wheresoever testatrix's sympathies were centered in the early part of the marital troubles of her mother and father, in the divorce matter they were strongly with her father. This episode of the estrangement between her parents figures as the beginning of the story unfolded at the trial. The break was followed by an estrangement between mother and daughter. *The latter from 1909 to 1929 saw her mother only once, that was in 1917.* After this long period of years the testatrix saw her mother on December 1, 1929, and a few times in December thereafter. About five months after her divorce, to wit, on December 6, 1906, Mrs. Norman married her present husband, John Jamieson, a wealthy man. Testatrix subsequently took up studies for the stage and later she appeared in " Peg O My Heart," " The Nest," " Upstairs and Down," " The Unchastened Woman " and other plays. In 1913 and 1914 she suffered ill health. Later she took up literary work, the writing of plays and scenarios. On June 30, 1919, she married her husband who had been previously married and divorced. In 1925 she instituted an action for divorce. It was tried and decision was rendered against her. In the fall of 1925 she had ceased to live with her husband and the estrangement continued until her death.

On December 6, 1929, she executed the propounded paper in the offices of her attorneys. It had been prepared by one of the firm

with the names of the various beneficiaries left blank, to be filled in by her. Then it was written out by her in completed form. On December 13 and 31, 1929, she wrote letters of instruction to her executors concerning the defense of her will in the event of a contest. She died by suicide on March 6, 1930. The provisions of the propounded paper bequeathed legacies to the following:

All her jewelry and personal effects to Miss Claire Cassel, except a diamond ring which she gave to Eleanor Hayden; a sum sufficient to take care of her cemetery plot; $125 in trust for the perpetual care of the grave of her dog; $50,000 to " my friend Miss Claire Cassel;" $40,000 to " my friend John H. Hayden;" $10,000 to " my friend Eleanor Hayden;" $15,000 to " my friend Mrs. Anita Carstarphen;" $15,000 to " my friend Frank E. Carstarphen;" $1,000 to " my cousin Louise McElhinny;" $5,000 to Emily Moeslein, and $5,000 to Mary Grayson, the latter two having been formerly in her employ. All the rest, residue and remainder of her property she bequeathed to the persons who received cash legacies, in proportion to the amounts bequeathed to them. She appointed her " friend and attorney Arthur Garfield Hays," and the Equitable Trust Company of New York executors of her will without bond. No bequest or devise was made in the will to her mother or her husband, the contestants herein. Her estate amounts to approximately $170,000.

At the trial a large array of witnesses was presented; in all fifty-two witnesses, thirty-one for proponent and twenty-one in behalf of contestants. The contestants' proofs on lack of testamentary capacity on the part of testatrix brought out the story of her life from its early beginning in Cincinnati, Ohio, down to her death; suicidal tendencies upon her father's side; the history of epilepsy on her mother's side; the episode of the divorce of her father by her mother; the sympathies of decedent with her father; her illness from time to time, particularly in 1913 and 1914; her dread of tuberculosis at that time, and later her haunting fear that she would become a victim of cancer; her stage career; her career as a writer of plays and scenarios; her life with her husband; the divorce case and her brooding over her failure to secure a divorce; her yearning later to be free by securing a Reno divorce; her mode of living after the estrangement had come between her and her husband; her visits with doctors; her social life; her longing for a renewal of a stage career; her adoption or use of her maiden name and stage name, Christine Norman; her conversations with her aunt and with her mother.

The contestants' claims on the subject of testamentary capacity are based principally upon the following: (1) That she had con-

templated suicide on several occasions and that she actually did commit suicide by jumping from the twentieth-story window of the Hotel Warwick in New York city; (2) that the testatrix's father's uncle went violently insane and hung himself and her father's brother killed himself; that on testatrix's maternal side there was epilepsy; (3) that on a number of occasions she suffered from "psychasthenia" and "exhaustive neurosis;" (4) that she continually disregarded the name Booth and used her own maiden name instead; (5) that the witnesses adduced on behalf of the contestants established that the testatrix was irrational.

Two alienists were called by contestants and testified in answer to hypothetical questions. They were Dr. Philip J. Trentszch and Dr. Beverly Chaney. Dr. Trentszch developed out of that portion of the evidence embraced in the hypothetical question asked by the contestants a theory that testatrix was suffering from a mental disease which he termed "schizophrenia"— translated into English as "split personality." Dr. Chaney in substance agreed with Dr. Trentszch as to the nature of her irrationality, emphasizing the fact that she was dominated by the emotions of love and hate. The testimony in the direct of these two alienists is of little or no value; as proof of lack of testamentary capacity it has no weight; and whatever worth it may have in favor of contestants' case was entirely destroyed by their cross-examination, as shown by the following excerpts from the testimony. Dr. Chaney testified on cross-examination: "Q. If there were good reasons for what love she exhibited and good reasons for what hate she exhibited, you would regard that as rational, would you not? A. Not necessarily so. Q. Well, at any rate, if they were good reasons, the fact that she acted upon those emotions would not indicate any irrationality would it? A. No, not of itself. * * * Q. So far, for instance, as her property was concerned, would your opinion of her irrationality go so far as to say that she did not know what property she owned? A. As I recall, there was nothing in the hypothetical question which would indicate that she did not know the extent of her property. * * * Q. Is there anything from the evidence you have heard and referred to in the hypothetical question that would indicate that she did not know what relatives she had? A. No. Q. Or that she did not know who her friends were? A. I do not know. * * * Q. You have nothing in mind that recalls that to your mind? A. No. * * *"

By the surrogate: "Q. Do you feel committed by the answer given to the hypothetical question, in any way, one or another, to the proposition that she did not know the nature of the act that she was performing when she made the will? A. I think she knew

the nature — I think she knew that she was making a will. It is my belief that her judgment was influenced by certain mental factors which made her unable to appreciate those who by kin or blood or affection were the natural objects of her estate."

By Mr. Hays: "Q. You will agree with me when she drew up that will she knew she was not leaving money to her mother or to her husband, didn't she? A. I believe that she knew she was making a will. Q. Didn't she know that she was leaving them out? A. No doubt she did. * * *"

Dr. Trentszch testified on cross-examination: By the surrogate: "Q. In other words. put it this way: Do you think from what you have seen of the hypothetical question and the instrument now before you that she realized the nature of the act she was performing when she disposed of her property? A. Oh, yes, surely."

The testimony of the alienists is so weak, so theoretical, and so lamentably uncertain on cross-examination as to be most negligible.

Mary Grant, the colored maid employed in the home of testatrix and her husband, testified that testatrix was irrational at times. On cross-examination, however, she modified her testimony by stating that she thought that testatrix was not quite rational because she made her take her dog out four or five times a day, whereas in her own opinion twice a day was sufficient. Another occurrence which in this witness' mind appeared as irrational was testatrix's rushing back to her apartment after having left it to keep an engagement, because, as she told the witness, she was being followed by some man. She testified, however, that testatrix was intelligent and perfectly rational in her speech.

Another witness called by the contestants, Mrs. Anna McElhinny, an aunt, testified that she saw testatrix three or four times in November, 1929, and from her acts and conversations believed her to be irrational. On one occasion the testatrix said to her: "I am crazy, you are crazy and Louise is crazy." She further testified, "then she sat down in a chair and cried * * * and said, ' Oh, Aunt Nan, I am so sick' * * * 'I have a very weak heart. I am having a great deal of heart trouble, and, oh, Aunt Nan, my mind is gone. I am crazy.'" On another occasion the testatrix said: "I am going to murder my mother and Mr. Booth and then destroy myself." This witness further testified that on another occasion testatrix said: "My father has come to me and told me that he cannot come to me but I can come to him, and I am going to destroy myself so that I may go to my father." This witness also testified that testatrix in about 1905 told her never to mention her mother's name to her. She described the testatrix, however, as very intelligent, but as lonely, distressed and discouraged.

It is difficult to understand how and why the contestants try to urge against the possession of testamentary capacity the fact that testatrix continually disregarded the use of her husband's surname and used her own maiden name. There can be no question that she did at various times use her maiden name. But no conclusion may be drawn from such a practice or habit as contestants contend. Such a practice has always been quite general among theatrical folk, and in later years some ladies not of the theatrical or literary world have adopted the habit.

The proponents' proof as to her testamentary capacity may be summarized as follows: (a) The will was executed in the office of the attorneys for the proponents in the presence of two lawyers, members of that firm, Mr. St. John and Mr. Abrahamson, who testified that the testatrix was of sound mind, under no restraint and subject to no influence whatsoever. (b) The will was holographic, was drawn with considerable deliberation, and its provisions, as above set forth, considering the estrangement and bitter feelings toward her mother and husband, contain a natural distribution to the friends whom she considered nearest and dearest to her. (c) Impressive evidence upon the subject of her rationality was given by various witnesses, lay and professional. Among them were Dr. John F. Erdman, the eminent surgeon, Norman F. Lovett, assistant district sales manager of the Chase Securities Company, and former Justice Alfred R. Page. Dr. Erdman testified as follows:

Direct examination by Mr. Hays: " Q. Doctor, where do you reside? A. 60 West 52nd Street. Q. Your profession, are you a medical doctor? A. Yes, sir. Q. Did you know Anna Christine Norman Booth? A. Not as Anna Christine Norman Booth. I have her down in my records as Christine Norman. Q. May I ask you when you first met her or saw her? A. September 1, 1926. * * * Q. At that time, will you tell us what you observed of her physical condition? A. She came in to consult me in regard to something that she had in the abdomen. Q. Did you examine her? A. I did. Q. Did you afterwards operate on her? A. Not at that time. Q. When did you see her next? A. December 14, 1926. Q. Did you have a talk with her on that occasion? A. Yes, sir. Q. What was her condition then? A. She felt that she had some nausea and had vomited at one time, and on an examination there was a bit of tenderness in the right lower quarter, that is the lower half of the right side. * * * Q. Did you have a conversation with her on those two occasions, Doctor? A. Yes. Q. What did you talk about? A. Her history, her symptoms, what she suffered from. Q. Did she tell you her

personal history? A. No. Q. Just her physical condition? A. Her medical and physical condition. Q. Did she tell you about her work, what she was doing? A. No. Q. About how long was she with you? A. You mean the first time? Q. Yes. A. I should judge about fifteen minutes. Q. On each of these two occasions? A. Yes, sir. Q. You asked her questions? A. Yes, sir. * * * Q. Was she coherent in her answers to you? A. Quite so. * * * Q. When was the next time you saw her, Doctor? A. On the 17th day of December, 1926, I operated upon her. Q. For what? A. Appendicitis. Q. Did you talk to her at all before the operation? A. No, not outside of this time I gave you the record of the 14th. Q. I mean on the day of the operation? A. We always say, How do you do, and I hope you will get through all right, things of that sort. Q. Was she calm at that time? A. Fairly so. Q. Will you describe Miss Norman as you saw her and knew her at that time, what she looked like and how she bore herself? A. I should say that she was rather a prepossessing woman, rather entertaining in her speech; a little too obsessed, possibly, about her sufferings. Q. Did you after the operation see her on occasions? A. The 15th of January, 1927, the 13th of January, 1927, the 12th of March, 1927. The 27th day of December, 1928. The 13th day of June, 1929. The 15th day of February, 1930. Q. Leaving out for the moment the last date, the 15th of February, on those other occasions did you have conversations with her? A. Merely with reference to her physical condition. Q. Can you give us just as an illustration one of those conversations, the substance of what was said? A. A patient comes into my office and I ask them how they are feeling, if they are better or worse; if there is anything new, and that is all the conversation that occurs, and we take their answers."

By the surrogate: "Q. What was the last date in 1929, Doctor? A. June 13, 1929."

By Mr. Hays: "Q. You stated the last time you saw her was on the 15th day of February, 1930? A. Yes, sir." Mr. Hays: "I would like to ask that, but only to remain in evidence if you sustain objection after the 6th of December." The surrogate: "It will be accepted with that understanding." Mr. Hays: "If the other evidence is stricken out, I may strike this out." "Q. Can you tell us what the subject of conversation was on the 15th day of February? A. Yes, sir. I have copied here several of her statements to me. Q. Will you give us those? A. One was, 'I am all shot to pieces. I have lost weight for six months past. I have flowed for a week with no let-up. The last flowing was one week. I have flushes. Everything feels far away. There is

drumming in my ears.' That is all. Q. Did you prescribe treatment at that time? A. I did prescribe. Q. What was that? A. I prescribed triple bromides, some quinine and strychnia, and stated to her if she bled any more she should come in for a diagnostic curettage, which means a scraping of the cavity of the womb, and the scraping should be examined microscopically to see whether it was a malignant or some condition causing the bleeding. Q. Were these acts, her bearing, and the conversation as you have described them here, Doctor, did they impress you as rational or irrational? " Mr. Mooney: " I understand this to be as to a lay witness." Mr. Hays: " Yes." " Q. Did these acts and bearing and conversation as you have testified to them here, impress you as rational or irrational? A. Absolutely rational. Q. You mentioned something about the curettage to find out whether there was a malignant growth. A. Yes, sir. Q. A cancerous growth? A. Yes, sir. Q. An operation of that sort would show it? A. Ordinarily. Q. You found that she was worried on the subject, didn't you? A. It was not a question of her worry, as I was worried. If the woman was bleeding I wanted to know just why she was bleeding. Q. That, and the loss of weight were both significant, I suppose? A. They would be significant."

Cross-examination by Mr. Mooney: " Q. Did the lady tell you that she had consulted a physician in California? A. I do not recall. I have no notes to that effect. Q. And a physician out in California had been recommended to her as a man eminent in abdominal matters by a lifelong friend of hers? A. I have no note of that. Q. Did she tell you that she had had, for a long while, a considerable fear in her own mind as to the possibility of cancer? A. No, sir. Q. Did she tell you that her father died of cancer? A. She did not tell me that he died of it. But on the 31st of January, 1927, she said that her father is sick with cancer of the bladder, and not walking, she used the term, ' all busted up.' Q. And she told you that as late as the 31st of January, 1927? A. Yes, sir. Q. Did she ever refer to it again? A. I have no recollection or no note of it at all. Q. Of course, we all know your eminence in the profession, Doctor; did the mention of cancer — did it have any effect upon you in subsequent suggestion that there should be this scraping with respect to herself? A. Not at all, because I do not think it is hereditary or contagious. Q. You ought to know. A. Not necessarily. I think so. Q. You don't think it is hereditary? A. I do not, no, sir. Q. Then I must bow to you. Have you ever operated for cancer? A. Possibly four or five times a week. Q. I only want to know whether it is your theory whether cancer is not hereditary. A. It is. Q. You really did not think

that that note about her father really meant anything from a pathological standpoint? A. No, sir, not from a pathological standpoint. Q. Now we will come down to the question of what she said as to her visits to others in the way of medical treatment. Did she tell you what she had undergone in that respect, and the doctors she had been to? A. I have no record of it at all, and I do not recall it. More than likely she did say something about these various men. My office is a consulting office and people have been to other doctors before they have been there. Q. Your questions of her and your intercourse with regard to symptoms is largely the politeness of the operating surgeon? A. I suppose so. Q. You do not claim you have approached this case from any standpoint of finding out what her mentality was? A. Nor from a social standpoint, no, sir. Q. In other words, people must be operated on whether their minds are good or whether their minds are bad? A. Not necessarily. If I had someone whose mind was very bad and the operation was merely an operation of election, I should not operate on them. Q. Did it turn out that she had appendicitis? A. Yes, sir; the pathological report. Q. That is the result? A. Yes, sir."

Mr. Lovett testified as follows: Direct examination by Mr. Hays: " Q. What is your business? A. Assistant District Sales Manager of the Chase Securities Corporation. Q. What was your work in December, 1929? A. I was Associate Manager of the Equitable Trust Company in charge of the bond department, at 45th Street. Q. At that time did you know Anna Christine Norman Booth? A. I did. Q. When had you first met her? A. About the latter part of October, 1929. Q. I show you a paper and ask you if that is an inventory of the securities left with the Equitable Trust Company for safekeeping by Anna Christine Norman Booth. A. I would say, yes." Mr. Hays: " I offer that in evidence." (There being no objection, the same is marked in evidence Proponent's Exhibit No. 124.) " Q. This exhibit, 124, shows that cash and securities with the Equitable Trust Company amounted to $144,123.57. Q. That was an inventory of what was in her account at the time of her death, Mr. Lovett? A. I think so. Q. I show you a number of papers and I ask you if these papers of the Equitable Trust Company represent receipts for securities brought to the Equitable Trust Company by Anna Christine Norman Booth. A. Yes, sir, either brought there ·by her or put in her account, through purchases made by the bank. Q. Made by the bank on her order? A. Yes, sir, on her order." Mr. Hays: " I offer those in evidence." (There being no objection, the same is marked in evidence as Proponent's Exhibit No. 125.) " Q. I note here that on December 3rd she brought to your bank

ten $1,000 bonds of the Baltimore & Ohio Railroad Company and that that is the first of the dates." The surrogate: " Of 1929." Mr. Hays: " Yes, sir, 1929." " Q. Can you, from that, tell us whether on that date she brought those securities to the bank? A. Yes, sir. Q. Did you see her at that time? A. I think so, yes, sir. I think that I took those securities in from her. Q. And on December 9th she brought a number of securities to the bank worth perhaps thirty-five to forty thousand dollars, is that correct? A. Yes, sir. Q. Did you see her between those two dates, December 3rd and December 9th? A. I could not say definitely, but I feel quite sure I did. I saw her almost every day during December. Q. When did you say you first met her? A. The latter part of October. Q. Can you state the substance of any talks you had with her? A. I first came in contact with Miss Norman — she had some securities which were being delivered from a broker's office. I cannot remember now what office it was. Q. Was it Hirsch, Lilienthal & Company? A. I think it was, but I am not absolutely sure. She wanted to arrange to have these delivered to the Equitable Trust Company for her account. I do not remember whether I called up Hirsch, Lilienthal & Company, or whatever broker it was, or whether she did. Q. I want your contacts with her. A. Yes. Q. Did she have an account with you under the name of Christine Norman? A. Yes, sir, that was the only name I knew her under. Q. Miss Christine Norman or Christine Norman? A. Miss Christine. Q. And you called her Miss Norman? A. Yes, sir. Q. Did you have any discussion as to what name to call her by? A. No, sir. Q. She gave her name to you as Miss Christine Norman? A. Yes, sir. Q. Continue with this discussion. A. Miss Norman wanted to know if this could be arranged, and I said, ' yes.' It was just one of our regular transactions. We are doing it constantly, and as I say, I forget the details of carrying it out, but we arranged it for her, brought them up to the Madison Avenue office, and she took delivery of that matter. Q. That was what month? A. That was the latter part of October. Q. Did you see her there thereafter? A. Yes, sir, quite constantly. Q. About how often? A. I should think every other day on an average. Q. Until what time? A. Until after Christmas. Q. How long a time would you see her, five or ten minutes? A. Yes, sir, and sometimes half an hour. Q. Can you give us the substance of any conversation you had with her during that period? A. We talked entirely about the purchase of securities. *She told me that she felt very fortunate in having closed out her stock account just before the bad break that took place in the market along about the latter part of October, and it made her very*

*conservative * * *.*" By the surrogate: " Q. What did she say to you, withdrew her stock account? A. *Yes, sir, she closed it out just before the break in October, and it rather unnerved her in a way to have gotten out of such a lucky turn, and from then on she felt extremely conservative, and the securities she purchased through us, as I gathered from the plans she had with the brokers, were of a conservative nature.* Q. Tell us the kind of securities she instructed you to purchase for her. A. I have the card right here. Our first transaction with her was on October 29th." By Mr. Chambers: " Q. What year? A. 1929. This was all 1929. She sold some United States of Brazil 8 per cent bonds. She did not think that they were as good bonds as she should have. Q. What did she say about those bonds? I am trying to bring out whether she knew anything about the value of securities. What did she tell you about the bonds? A. She told me that she did not like the Brazilian bonds; that she felt that other South American countries were in a better financial condition and that she would rather invest in some other countries than Brazil, and even if it meant sacrificing something of interest on her money. She sold the 8 per cent bonds and in place of it she purchased some Argentine 6s, which are considered a higher grade bond. Q. Did she discuss Argentine 6s with you? A. Yes, sir. Q. What did she say about those? A. She felt the Argentine was a country in sounder financial condition than Brazil, and she felt she would rather have her money there than in Brazil. Q. And the date of that conversation was when? A. I would say about the time she made the sale and the purchase. She made the sale on October 29th, and she made the purchase of the Argentine bonds November 4th. Q. During that period in November can you tell us any other conversations you had with her? A. I see on the 6th of November we made further purchases for her of some more Argentine bonds, and also some of the Kingdom of Norway 5½ bonds. Q. Did you have any other further discussion about those? A. Yes. Again, she felt she wanted to be in high grade government securities, and she would prefer, that she would rather be in a European country than in South America. Q. That was November 6th? A. Yes, sir, November 6th. Q. Can you tell us any other conversation you had with her? A. Then I see we sold some stock for her on November 18th and on November 8th. Q. What was the stock? A. A hundred shares of American Investors class ' B ' stock. Q. At what price? A. 13⅝. And on the 18th 100 shares of Electric Power & Light 7 per cent preferred. Q. At what price? A. At 101. Q. Did you have any other discussion about those securities? A. I urged her to keep the Electric Power & Light

stock, but she wanted to be in a more conservative investment. She felt that it was not strong enough. Q. Do you know what she instructed you to buy in place of those securities? A. Yes. She waited about a week, and on November 26th she bought some Canadian National Railway 5 per cent bonds, guaranteed by the Dominion of Canada. Q. Did she say anything about those bonds, indicate any knowledge or information about them? A. Yes. Q. What did she say? A. She was familiar with the fact that the Canadian bonds were guaranteed by the Dominion of Canada. Q. Was it your suggestion or her suggestion to buy those bonds? A. I am not sure. I think it was her own. Q. Can you tell us any other conversation you had in the month of November? A. No, sir. It escaped my memory. I remember we had a good many conversations about the reinvestment of this money, but it was merely along the line that she wanted to be in something very conservative, that she would have no worry about whatsoever. Q. You note, Mr. Lovett, that one of these papers is dated December 3rd, and the other December 9, 1929. Can you, with that in mind, tell us whether you saw her between those two dates? A. I feel sure I saw her along the first part of December, because I am quite positive that all the securities that she brought in from other banks — I remember that she told me that she had a safe deposit box in the Chemical Bank, and I think it was the United States Mortgage & Trust — I am not sure about that. Q. Can you tell us definitely whether you saw her on the 3rd, 4th, 5th or 6th of December? A. The 3rd I feel positive I saw her, because I know I took in these Baltimore & Ohio Railroad bonds. Q. Can you tell us any conversation that then transpired? A. Yes, sir. She did this more or less at my instigation. She told me that she had her securities scattered around in two or three boxes, and I told her I thought she would have much greater peace of mind if she had it all in one place. This lasted over several days. She would come in and say, ' I have not had time to do that, but I intend to do it. I intend to clean out my box at the Chemical and bring them down here.' It was generally late in the afternoon that she came to the bank, and she would come in and say, ' I have done this, the securities I had at the Chemical Bank — ' I don't know which bank it was. Q. She started that account on the 3rd? A. Opened the safekeeping account? Q. Yes. A. I think so. I am not absolutely sure. Q. Did she ever say anything to you about drawing a will? A. Yes, sir. Q. What did she say? A. She said that she wanted to draw a will, and did we do it, the Trust Company, and I said, no, of course we did not. She said, ' Do you know any lawyers?' and I said, ' I do not

happen to know any lawyers myself here, but,' I said, ' Messrs. Murray, Aldrich & Webb are the lawyers for the bank and have offices in this building, and if you would like to see them I am sure it can be arranged.' Q. Did she ever tell you afterwards whether she had been to see them? A. It is my recollection that she went up one day and came back and said that she had waited a long time. I wrote down the two names at the time that I am familiar with in the Madison Avenue office, and although I do not know them personally — my recollection is that she came back and told me that she had waited a long time for either of these two gentlemen and she couldn't wait any longer that afternoon. Q. Do you know when that was, about? A. I would say it was around the first part of December, somewhere between the 1st and the 15th, I would say. Q. Did she ever talk to you about her personal affairs? A. No, sir. Q. Did she ever mention her husband to you? A. Not until she told me that she was going to Reno. That was the first time she had ever mentioned any personal affairs at all. Q. What did she say about that? A. She said she was going to get a divorce in Reno. Q. Have you in substance stated practically all the conversation that seemed to you significant that you had with Christine Booth? A. Yes, I think I have. Q. Now, from the acts and conversations and conduct of Christine Norman Booth, as you have testified to them here, did you form any impression that those acts and conversations were rational or irrational? " (Objected to as incompetent. Objection overruled. Exception.) Q. (Repeated.) " A. Absolutely rational. Q. You never had any question about it, did you? A. None whatsoever." Cross-examination by Mr. Chambers: " Q. First of all, you say that she discussed her private affairs and divorce with you? A. No, sir. Q. You said she discussed divorce with you? A. No. Q. I wrote it down, and you said ' discussed divorce with me.' A. She did not discuss the divorce with me, but said that she was going to Reno for the purpose of getting a divorce. Q. That was a personal, private matter? A. Yes, sir. Q. And that was unusual, wasn't it? A. No. Q. It was not unusual for a woman who had an account in her maiden name, to discuss that question with you, would you say? A. I would say that she did not discuss it with me. She was giving me her instructions for a change of address. She wanted to tell me what should be done about her mail and said that she was going to Reno and incidentally said that she was going to get a divorce. Q. Now let us see, Mr. Lovett. What business would you say you had with the Equitable Trust Company? A. Purchase and sale of securities. Q. Did she open up this account with you or with

somebody else? A. Somebody else. Q. And she opened it up as Christine Norman? A. Yes. Q. Miss Christine Norman, was it? A. Yes, sir. Q. How soon did you meet her after she had opened up the account? A. Are you referring to the safekeeping account or her bank account? Q. Either one. A. Practically when she opened the bank account. Q. Is that the only one you had to do with, the safekeeping account? A. Yes, sir. Q. When did she open that up? A. I think on December 3rd. Q. But not with you? A. No, I do not think so. Q. How did she come to talk with you? A. Because I happened to be the one who was handling the investment end of it, and that was practically the entire business she did with the bank. Q. That is, you were the one that recommended the switching of securities? A. Yes. Q. You were there to have her switch. That was good business, wasn't it? A. Yes, sir. Q. You would make a sale? A. Yes, sir. Q. And a commission would be made? A. Yes, sir. Q. Did she make some switches? A. Yes, sir. Q. And you recommended these to her? A. Yes, sir. Q. Until the last end of her talks with you, you assumed that she was a single woman? A. Yes, sir. Q. Were the securities all taken in her name as Miss Christine Norman? A. Yes, sir. Q. And finally she told you that she was going to Reno? A. Yes, sir. Q. Did she tell you that she was married? A. No, but I assumed that from the fact that she was going to get a divorce. Q. Wouldn't you say that was unusual, for her to carry this account in her name as Miss Christine Norman when she was married? A. It was unusual, but not unheard of. Q. At least, you would say it was unusual? A. Yes, sir. Q. It showed secretiveness, didn't it? A. I suppose it did, yes. Q. You said she came in to see you often? A. Yes, sir. Q. And stayed how long, as long as half an hour or an hour? A. Sometimes. Q. Now, wasn't that unusual, for her to be running in there all the while? A. Well, yes, that was. Q. And spending so much time with you about these securities, you would say that was unusual? A. Yes, sir. Q. She was nervous, wasn't she, at least? A. Yes. Q. A nervous woman? A. Yes, sir. Q. Changed her mind back and forth, didn't she? A. Yes, sir. Q. You would say that her mind was unstable, wouldn't you? A. No, I would not. Q. You would not go so far as to say it was unstable? A. No, I would not. Q. Would you say it was shaky? A. No, I would not. Q. She changed her mind about these securities? A. Yes, that is not unusual. Q. Did she ever speak of John H. Hayden? A. No, I never heard of him. Q. Did she tell you that he had recommended this, that or the other as a good security? A. No. Q. She did not mention his name to you in any of the

conversations? A. No. Q. You say that she discussed drawing up a will with you, and you fixed it as between the 1st of December and the 15th of December, 1929? " Mr. Hays: " He said the first days of December." Mr. Chambers: " I beg your pardon. He said between the 1st day of December and December 15th, did you not? " The witness: " I would say so, yes." " Q. Did she ever report back to you as to whether she had drawn a will? A. No. My only recollection is that she came back and said that it had been too long to wait in Murray, Aldrich's. Q. And that was the only reason she gave you? A. Yes. Q. She indicated to you that she had gone to the lawyers that you recommended? A. That is my recollection. Q. The only reason she did not accomplish what she went for was because they had kept her waiting too long? A. Yes, sir. Q. That was rather unusual, wasn't it? A. I didn't know how much of a hurry she was in or how long she had waited or anything of the sort. Q. When did you last see her? A. I believe it was Monday, February 2nd, and the reason that I can fairly well place it is the fact that I went into Roosevelt Hospital for an operation on the following Tuesday and she had just come back from Reno or California a few days before, and I am quite sure that I saw her on that Monday. I certainly saw her between Thursday and Monday at the end of January. Q. And how did she look, bad? A. No, I thought she looked better. Q. You thought that she looked better after she came back than when she went away? A. Yes, sir." Redirect examination by Mr. Hays: " Q. You do not regard it unusual for a person to fail to wait for a lawyer? A. Certainly not. Q. You were asked about using the maiden name. It is unusual but not peculiar for a woman to use her maiden name? A. Yes. Q. If a person had a name that became known on the stage, would you regard it as unusual for such a person to use her maiden name? A. No. Q. You were asked if you thought it was unusual for a woman to spend so much time with you talking about investments and you said yes. A. Yes. Q. Was it unusual in her case, or was she interested? A. She was very much interested. Q. Do you regard it as unusual for a woman interested in her investments to talk it over with her bank? A. No, sir. Q. It is not unusual? A. No, sir. Q. And certainly not peculiar? A. No, sir."

Judge Page (called on behalf of the contestants) testified as follows: Direct examination by Mr. Mooney: " Q. Mr. Justice Page, I ask you to look at contestants' Exhibit 154, which is in photostatic form, and to state whether you recognize your signature thereon. A. Yes, sir. Q. Do you recognize any signatures on that as made in your presence? A. Yes, sir, there was a signature of

Mr. Norman and Mrs. Morgan, Margaret Booth Morgan. Q. Who, if anyone, other than yourself and the subscribing witnesses, were present at the time that that certificate was made by you? A. Well, Mr. Booth and Miss Norman were both present. Q. And Miss Norman was the lady you had just married to Mr. Booth? A. Yes. Q. Was that executed in their presence? A. It was. * * *" By Mr. Mooney: " Q. You did know, did you not, that Mr. Norman was the father of the bride? A. Yes, I was introduced to him at that time. I was not acquainted with either Mr. Norman or Miss Norman until I was introduced to Miss Norman by Mr. Booth, himself, when we went up to his apartment." Mr. Mooney: " Thank you." Cross-examination by Mr. Hays: " Q. Oh, Judge Page, I have one or two questions: Did you know Christine? A. Why, do you mean after she was married? Q. Yes. A. Yes. Q. When did you last see her? A. Oh, I do not think that I saw her after the divorce action. Q. That was in 1926, did you see her? A. Possibly before. Some time before that. Q. Did you ever talk with her? A. Oh, certainly. Q. Can you give us the substance of any conversations? A. Oh, no, I certainly could not. Q. Can you tell what you talked about with her? A. Why, we talked — Mr. Booth was at one time my partner, and we were more or less intimate in our conversations, and they were those such as would occur between friends, but we did not discuss any subjects that I can recall particularly. Q. Did you talk to her about the stage? A. Oh, somewhat, yes. Q. And about her work on plays, writing plays? A. Yes. Q. Was she coherent in her conversations? A. Oh, yes, entirely. Q. Was she intelligent? A. Yes, certainly. Q. Were her answers responsible? " Mr. Mooney: " This is not cross-examination." Mr. Hays: " No, Judge Page is my witness on this examination." " A. It is a number of years since I have seen her. Q. She was always responsive in her answers? A. Oh, yes. Q. From her bearing, and demeanor, and the talks she had with you, and in your testimony as you have stated it here, did those acts and her conversation and bearing impress you as rational or irrational? " Mr. Mooney: " One moment. I object to that upon the ground that that is not a competent question." The surrogate: " The objection is overruled." Mr. Mooney: " I take exception." " A. Why, entirely rational." Mr. Hays: " That is all, thank you." Cross-examination by Mr. Mooney: (On Mr. Hays' direct examination): " Q. Your meetings with her were rather limited, Judge Page. That is to say, they were mere social interchanges? A. Oh, yes, that is all. Q. You did not talk to her on any sustained subject of conversation, did you? A. Well, I do not know as to that. The — Q. I mean

by that that you do not recall now any sustained subject of conversation or reasoning, or anything of that kind? A. No." Mr. Mooney: "That is all." Redirect examination by Mr. Hays: " Q. Judge Page, were you ever away over week-ends when Mrs. Booth was along? A. Why, yes, Q. You did see her on occasions for, perhaps, hours at a time, did you not? A. Oh, yes." Mr. Hays: " Yes, thank you. That is all, Judge." Recross-examination by Mr. Mooney: " Q. And when did you see her last, Judge Page? It seems as though we are making pretty much of a witness out of you now. About when, with relation to the time of her death, if you recall her death, was the last occasion that you saw her? A. Well, I could not give you definitely. It would be some two or three years, I should think." Mr. Mooney: " That is all." Redirect examination by Mr. Hays: " Q. Do you happen to know the last time that Mrs. Page saw Christine? Do you know how long ago that was? A. No, not definitely. Mrs. Page saw her more frequently than I did. She saw her after the trouble between Mr. Booth and herself. I did not. Q. Mrs. Page is not well, I understand. A. Mrs. Page is in bed with a broken leg, a leg in a cast. She could not possibly attend here."

(d) In addition to these witnesses the following testified definitely in favor of her rationality: (1) Alan R. Hawley, ex-president Aero Club of America; (2) James W. Conroy, proprietor, Gladstone Hotel, who described her as "rational;" (3) Albert F. Miller, proprietor, Hotel Warwick, where decedent lived in 1927, in 1929 and in 1930; (4) Maxwell M. Kennedy, clerk of Hotel New Weston; (5) Stephen M. Livingston, assistant secretary and assistant treasurer of the safe deposit part of Chemical National Bank; (6) Brock Pemberton, a theatrical producer; (7) Miss Madeline Healy, connected with William A. Brady, theatrical producer, who told of the plays in which she acted, who considered her a fine actress, who saw her again in November, 1929, at the Play House, and had conversations with her about engaging her for a part in " Street Scene " and who said she was " coherent, responsive and rational; " (8) Estelle Curé, buyer of sports clothes for Hickson's; (9) Charles A. Hurley (by deposition); (10) Selma Lavern, public stenographer who worked with decedent; (11) Laura D. Wilck, play broker; (12) Howard Morley, manager Brooklyn bond division of International Paper Company; (13) Mrs. Richard Gordon; (14) Harry Cassel.

(e) In addition to these witnesses it may be noted that the following witnesses called by the contestants declared her to be rational: (1) Virginia Cooper Davis; (2) Martha W. Page, assistant superintendent. Brattleboro Memorial Hospital; (3) John

Ponselle, chauffeur employed by decedent's mother; (4) Judge Alfred R. Page, quoted above; (5) Walter H. Cooke, detective in the divorce action for the plaintiff.

(f) Contestants have stressed during the trial and in their briefs what they call an *unnatural feeling* of testatrix toward her mother and her husband, as strong evidence of her mental unbalance. The best answers to their contentions in this respect are the missives in which she explained her attitude in her will toward her mother and her husband. The following enfolds at least some of the reasons in back of her feeling toward her mother. A letter dated December 9, 1929, three days after the execution of her will, addressed to her executors reads: " To my Executors — I have left a note in box 204 at the Chemical Trust Co.— 45th St. and Madison Ave., to the effect that I have not left my mother anything in my will because of her treatment of me as a child and young girl, also because for over twenty years she has taken alimony from my father — and now from his estate although she is married to a rich man. I have lately tried to see if my mother was capable of kindness towards me or maternal love and found that she was not. Christine Norman."

Another letter addressed to her executors, dated December 31, 1929, reads as follows: " To my executors — My mother, Mrs. John Jamison, *must not* have anything belonging to me. As I stated in another letter, she was cruel to me as a child and young girl. Her cruelty and lack of consideration and care has had a devastating effect on my health and nerves all my life. Although she is married to a man who can afford to pay $12000 a year for the apartment in which they live, my mother still takes $1000 a year from my father's estate and has been taking it for over 23 years, even though she has been married all that time. I asked her if I could now have the $1000 a year, to which she has no right anyway. After being absolutely insulting to me about it she let me have one quarterly payment of $245 — then said that was all I could have. It is evident that she and Mr. Jamison are planning to cheat me out of money which she has and which was left her by my grandmother and my aunt. Mr. Jamison, with all of his wealth plans to take that money away from me in case of Mrs. Jamison's death. In case Mrs. Jamison should attempt to break my will I wish my executors to use in court, as testimony, a letter which my executors will find in this safety deposit box (204), addressed to my father, Mr. A. G. Norman and written by my mother, in which she blackmails him through me. I am certain that such a dastardly and vile letter was never written by a mother before and it would absolutely prevent her from being able to

break my will. I write all this because I could not rest in my grave if she ever got any of my father's or my money or property. Christine Norman Booth Dec. 31, 1929. The letter to which I have referred was written to my father by my mother at the time she was getting her divorce from him. Christine N. Booth."

The missive to the executor concerning her husband in her will clearly and definitely explains her feelings toward her husband and in part her reasons for omitting him from her benefactions.

After all the proofs are analyzed, studied, sifted and weighed, of necessity the whole story for and against her mental capacity must be submitted to the final test, the true measure, the standard laid down in the higher courts by which testamentary capacity is determined. Whatever may have been her foibles, her oddities, her idiosyncrasies, if we may use the term, her moods, her temperaments, her temper, her physical or mental impairment, the final arbitrament lies in the true and correct answers to the queries: (1) Did she know the nature of the act that she was performing in executing the will? (2) Did she know the scope and extent of the property that she was disposing of? (3) Did she know the names and identities of those who were the natural objects of her bounty and her relations with them? There can be not the slightest doubt that she knew and fully realized the nature of the act she was performing for this fact is clearly shown by the testimony of the subscribing witnesses, by the deliberation exercised in the preparation of the will, by the instrument itself and by letters subsequently written in which she refers to the will. That she knew the extent and scope of her property is abundantly and conclusively shown. The legacies in the will amount to $150,000, while her estate has been estimated at $170,000, and proofs submitted showed at least upwards of $144,000 in the estate.

The testimony of various witnesses clearly shows how keen her mind was in handling her financial affairs. The testimony of Norman F. Lovett, quoted above, presents a vivid picture of the alertness of her mind with respect to her purchase and sale of securities. Particularly significant is the fact, as testified to by him, that *before the crash in the stock market of 1929 the testatrix entirely closed out her account.* Moreover, there can be no serious question raised as to her knowledge of the names and identities of those who were the natural objects of her bounty. This fact is definitely shown by the letters which she wrote to the executors of her will. And the proofs present most plausible reasons for every bequest made.

The proponents have sustained the burden of proof resting upon them in the matter of testamentary capacity. I hold that at the

time she executed the propounded paper testatrix possessed testamentary capacity. I further hold that at the time she executed said paper all the requirements as to proper execution of a will were complied with.

There remain to be considered the framed issues of undue influence and fraud. The contestants' case in this regard is confined to and involves one John H. Hayden, a former client of the husband of testatrix. Both documentary and oral evidence were produced for the purpose of showing that said Hayden wielded an undue influence. The documentary proofs included various letters written by Hayden to decedent. The oral testimony brought out the interest which Hayden took in the preparation and trial of decedent's divorce action against her husband in which decedent was defeated and failed to secure divorce. It was developed that Hayden conferred with the detectives who were employed in the divorce matter and that he was present at the trial. It was pointed out that in the will Hayden was bequeathed $40,000 and his daughter was bequeathed $10,000, a total of $50,000.

So far as the record of Hayden's attempts at love-making and his scheming to bring about a divorce between testatrix and her husband goes, it has much weight along the line of proof tending to show a force working upon the mind of testatrix through the years in question. But whatever the force was and howsoever it operated, the query comes, was it the cause of the coldness and estrangement between testatrix and her husband in the beginning of their breach, and did it continue down to and control the provisions in the will?

Right here we are led to the rebuttal testimony and confronted with the following points brought out by proponents: (1) There had been a coldness existing between testatrix and her husband some time before she had met Hayden. (2) Her husband had been previously married and divorced. (3) As early as 1921 in Paris testatrix had declared that she was going to divorce him. (See testimony of Max Eastman, pp. 686–690.) (4) *On March 31, 1921, viz., prior to her meeting Hayden, and five years before her divorce action,* she had executed a will in which she bequeathed to her husband only such property as she had received from him. (5) The letters of decedent addressed to Hayden during the times when his flaming letters were sent to her — at least such of her letters as were produced in evidence — do not manifest any degree of responsiveness on her part. They are simple and conservative missives. The letters and actions of Hayden did show a man seeking to win the affections of testatrix and to that extent of alienating the affections, if any, of testatrix for her husband. But the proofs

were that he did not succeed, and that her affections for her husband were abated previous to her meeting Hayden. Max Eastman, an author and lecturer, testified that he met the testatrix in Paris in 1922 where she was traveling under her maiden name and that she stated to him that she hated her husband and was going to get a divorce from him.

(6) When testatrix underwent an operation for appendicitis in 1926, the name of her nearest relative was given as A. G. Norman, her father, and the person to be notified in the event of any emergency as that of Miss Claire Cassel. Neither her mother nor her husband was mentioned. Laura D. Wilck, a play broker, who saw testatrix for the last time in June, 1929, testified that testatrix told her about four years prior thereto that she was trying to get a divorce from her husband and spoke about how very unhappy she was. In 1923 testatrix told Harry Cassel, another witness, that she was not getting along with her husband, that she thought she had made a mistake in marrying him.

(7) The will itself, i. e., its provisions, does not manifest successful results of an undue force or coercion operating upon the mind of testatrix. True, there are two bequests favoring Hayden and his daughter, but, in the face of the record, the money bequeathed was only approximately the amount received by testatrix from Hayden, plus its accretions.

The contestants, I find, have failed to sustain the burden of proof resting upon them in the issue of undue influence and fraud. The objections to the probate of the propounded paper are overruled. Submit decree admitting the will to probate.